IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RYAN LEWIS STEINHOFF,

                            Plaintiff,

     v.

MATTHEW MALOVRH,
CHARLES RAMBERG,
CODY KOWALCZYK,
CLARK COUNTY, and
TAYLOR COUNTY,

                            Defendants.

OPINION AND ORDER

21-cv-664-wmc

---

During the predawn execution of a warrant to search a rural compound where methamphetamine trafficking was suspected, plaintiff Ryan Steinhoff claims that three members of a much larger SWAT team -- Clark County Sheriff's Investigator Matthew Malovrh and Patrol Captain Charles Ramberg, as well as Taylor County Detective Cody Kowalczyk -- used excessive force in arresting him in violation of the Fourth Amendment and 42 U.S.C. § 1983.  Before the court are plaintiff's motion for partial summary judgment (dkt. #33) and defendants' motion for summary judgment on the merits and under the doctrine of qualified immunity (dkt. #37).  The court will grant defendant Ramberg's unopposed motion for summary judgment and defendant Kowalczyk's motion for summary judgment as to his split-second decision to take plaintiff Steinhoff to the ground, as well as deny plaintiff's partial motion for summary judgment.  However, there are disputed issues of material fact as to both the circumstances surrounding Malovrh's use of force in subduing Steinhoff, and amount of force he actually used, to deny his motion

for summary judgment.[1]  Finally, because both counties' alleged liability is purely derivative of their individual employees' liability, only Clark County will remain a defendant based on its possible obligation to indemnify plaintiff for its employee Malovrh's liability.

## UNDISPUTED FACTS[2]

### A.  Background

Plaintiff Ryan Steinhoff is a resident of Wisconsin.  Defendants Clark County and Taylor County are both in the State of Wisconsin and named for indemnification purposes only.[3]  For all times relevant to this case, defendant Cody Kowalczyk was employed as a detective with the Taylor County Sheriff's Office, while defendants Charles Ramberg and Matthew Malovrh were a patrol captain and an investigator with the Clark County Sheriff's Office, respectively.

In the summer and fall of 2018, the Taylor County Sheriff's Office was investigating Steinhoff and others for methamphetamine trafficking.  On October 27, 2018, Taylor County Detective Kowalczyk applied for a "no-knock" search warrant for a rural property in Medford, Wisconsin, where he believed Steinhoff and others involved in the meth trade were staying.  A Taylor County Circuit Court judge signed a search warrant for the

---

[1] Given the close nature of Malovrh's qualified immunity defense, the court will reserve on whether he is entitled to that defense on a full trial record.

[2] Unless otherwise indicated, the following facts are material and undisputed when viewing the parties' proposed findings, responses, and related evidence in a light most favorable to the non-moving party.

[3] Plaintiff does not assert *Monell*-type claims against either county.

property, including its multiple outbuildings where some suspects were suspected to be staying.  However, the judge did not approve the no-knock provision.

Before executing the warrant, a SWAT team composed of law enforcement officers from both Taylor and Clark Counties, including defendants Kowalczyk, Ramberg, and Malovrh, met for a briefing about the ongoing drug investigation, the warrant's execution, and the criminal history of the individuals suspected to be on the property.[4]  Among other things, defendants discussed Steinhoff's previous convictions for several crimes, including robbery with the use of force, aggravated battery, and resisting an officer, along with the possibility that he might attempt to flee during the warrant's execution given his past interactions with law enforcement officials.

### B. Execution of Search Warrant

The SWAT team executed the search warrant in the dark shortly before 6:00 a.m. on October 28, 2018.  Upon arriving at the property, Detective Kowalczyk was among those who went to the main residence, while Captain Ramberg, Investigator Malovrh and others secured the perimeter.  Occupants of the main residence told the SWAT team that there were other people staying in a camper on the southern part of the property.  The camper was then approached by at least five law enforcement officers.

As officers neared the camper, Captain Ramberg saw activity inside.  When the officers reached what appears to be the smaller of two campers, a Clark County law

---

[4] Execution of the search warrant was a joint effort between law enforcement agencies in Taylor and Clark Counties, both because of the size of the property to be searched and the number of individuals believed to be living there at the time.

enforcement officer announced, "Sheriff's Department," at which point Ramberg saw the camper door briefly open and close.  Ramberg next went to pull the door open himself, but did so hard enough for it to bounce off the outside of the camper and immediately swing back shut, prompting Ramberg to pull the door open again.

As Captain Ramberg opened the camper door a second time -- with the other officers' firearms fixed on the doorway -- the entryway turned out to be covered by a blanket that plaintiff Steinhoff was standing behind.  Next, either Captain Ramberg or Detective Malovrh approached the doorway and pulled the blanket down.  An officer then yelled for Steinhoff to show his hands, which both Ramberg and Malovrh could see were empty at the time.  Officers also saw no visible bulges on Steinhoff's person that resembled a weapon.  While Steinhoff did not immediately raise his hands, he began to walk down and out of the camper deliberately within five seconds of his initial encounter with the officers.

### C. Steinhoff's Arrest

Certain portions of Steinhoff's arrest described in this section were captured by a body-worn camera carried by a non-defendant, Clark County Deputy Sheriff Joshua Niemi (*see* Niemi Body Camera Footage ("B. Cam.") (dkt. ##36, 43-1) 7:32-8:25, 8:41-8:52, 11:03-11:15), particularly during the short, few seconds before plaintiff's takedown. Unfortunately, the video is taken at some distance from the relevant events and does not definitively resolve the central, remaining factual dispute with regard to Malovrh's actions to restrain Steinhoff once he was on the ground but not yet in handcuffs.

Roughly 30 seconds before Steinhoff appears at the small camper's doorway, a SWAT team member opens the outer solid and then inner screen door and yells inside, "Sheriff's Department, show me your hands." (B. Cam. 7:04-06.) As Steinhoff apparently appears, a more distant voice again yells, "show us your hands," then a closer voice tells him to "come on out," which he appears to do by casually taking the few steps down from the doorway to the ground. (B. Cam. 7:30-39.) As Steinhoff is doing so, he is then told more forcefully, "get out" and "turn around," to which he also appears to comply. (B. Cam. 7:39-41.) Specifically, upon reaching the ground, Steinhoff is already turning to his left towards the camper in apparent response to the direction to "turn around," while simultaneously extending his left arm and hand up and toward the camper wall, while his right arm is also rising from his waist. (B. Cam. 7:39-40.)

However, in response to the next two, increasingly rapid and louder orders to "turn around, turn around," Steinhoff does not appear to be turning further toward the camper, but rather is at least arguably working his way down the camper wall in front of the doorway, while also raising his right arm and hand above his head. (B. Cam. 7:40-42.) In the next split second, while an officer continues to shout even more urgently, "hands behind your back," Detective Kowalczyk has already started to take Steinhoff to the ground, an effort in which Malovrh quickly joined, purportedly out of concern Steinhoff might be attempting "to flee or reach for a weapon" and to assist Kowalczyk in "decentralizing" Steinhoff. (Malovrh Decl. (dkt. #41) ¶ 33.) At about this point, Steinhoff can be heard yelling out in protest, "Hey! Come on man!" (B. Cam. 7:42-44),

then groaning, followed by "What the f---. I didn't do nothing! Hey!" (B. Cam. 7:44-48.)

Then the following exchange can be heard but not seen:

| | |
|---|---|
| Officer: | Damnit, put your hands behind your back! |
| Steinhoff: | My hands are wide open. Why'd you force my hand open? What the f---! |
| Officer: | Who's got cuffs? |
| Steinhoff: | What the f---! |
| Officer: | You got cuffs there? |
| Second Officer: | Yeah. |
| Officer: | Otherwise I got a pair. |
| Steinhoff: | What the f--- you bust my head open for? |
| Officer: | Stay right there guy. |
| Steinhoff: | Get your knee off my head.  Why'd you bust my head? I didn't do anything! |
| Officer: | Now we're going to roll you over. |

(B. Cam. 7:50-8:24.)

During this exchange, defendants maintain that Steinhoff physically resisted the officers' efforts to subdue him with handcuffs; in direct contrast, Steinhoff represents that he continued to cooperate fully.  Because of the angle, officers blocking the way, and partial darkness, the video is wholly unhelpful in resolving this factual dispute.  As Steinhoff was being taken to the ground, a metal clink can be heard on a body-worn camera (and perhaps the shadow of a high caliber rifle swinging slightly away from the plaintiff and officers toward the camper).  There is also no dispute that Investigator Malovrh -- who was carrying an M16 rifle slung over his left shoulder with a strap -- was himself going to the ground at this point to assist Detective Kowalczyk.  While the clinking sound could be the rifle hitting the camper, Steinhoff insists this sound is Malovrh deliberately hitting him on the

side of his head with the rifle's barrel, causing what was later determined to be a cut on his ear, even as Kowalczyk continued to restrain him.

However, even Steinhoff concedes that all he actually saw was the rifle's barrel coming at him before he was hit in the head, and *not* Malovrh or what, if anything, Malovrh was doing with the rifle. Moreover, defendants all deny intentionally hitting Steinhoff with a firearm. Regardless, there is no dispute that Captain Ramberg subsequently restrained Steinhoff's legs, while Investigator Malovrh placed either his knee or left shin on his head, neck and shoulder area to secure him until Detective Kowalczyk could handcuff Steinhoff's hands behind his back then turn him over, all of which took some 30 to 40 seconds after Steinhoff was first taken to the ground. Shortly after that, Steinhoff can be heard to complain that the "gun [they] hit [him] with" had "split" his ear (B. Cam. 8:41-45), while officers responded to the effect, that's what happens when you resist, which Steinhoff again adamantly disputes on the tape. Steinhoff was then taken to a hospital, where he received stitches for a cut on his ear. Finally, after his arrest, Steinhoff complained of a cracked eardrum, as well as soreness in his neck and the back of his head, although no medical records have been produced to substantiate those claims.

## OPINION

Summary judgment is appropriate if the material facts are not genuinely disputed and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court reviews these cross-motions "construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party." *Wisconsin Cent., Ltd. V. Shannon*, 539 F.3d 751, 756

(7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

Plaintiff seeks partial summary judgment against defendant Kowalczyk with respect to his claimed use of excessive force in taking him to the ground, while all defendants seek summary judgment on the merits of all of plaintiff's excessive force claims. Alternatively, individual defendants Malovrh, Ramberg, and Kowalczyk assert entitlement to qualified immunity. Defendants also challenge as a matter of law plaintiff's entitlement to punitive damages or indemnification from the county defendants. Plaintiff now concedes that defendant Ramberg is entitled to summary judgment because he did not use excessive force against him. (Pl.'s Opening Br. (dkt. #34) 4; Defs.' Opening Br. (dkt. #38) 5.) Accordingly, summary judgment will be granted to defendant Ramberg. For the reasons set forth below, summary judgment will also be granted to defendant Kowalczyk on plaintiff's excessive force claim against him, while the claim against defendant Malovrh will have to go forward to trial.[5]

The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016)*; Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). This determination is made from the perspective of a "reasonable officer" in light of the totality of the circumstances known to the officer, without regard to his or her actual

---

[5] Because they are entitled to summary judgment on the merits of plaintiff's excessive force claims, the request for summary judgment on the punitive damages claim against Ramberg and Kowalczyk are moot, as is their request for dismissal of Taylor County as alleged indemnitor of Detective Kowalczyk.

intent or subjective beliefs. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). As a result, "whether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (*quoting Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)).

Still, it may be inappropriate to resolve excessive force cases at summary judgment when parties give different accounts of events. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009). Indeed, even though video evidence can sometimes "evaporate any factual dispute that would otherwise exist," *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022), it can only do so when the video is so definitive that there could be no reasonable disagreement about what the video depicts. *Kailin v. Vill. Of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Seventh Circuit has gone so far as to suggest that it is a "rare case" where video evidence leaves no room for interpretation by a fact finder. *Id.; see also Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021) (reversing a grant of summary judgment where reasonable jurors could have a range of conflicting interpretations of video evidence); *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (declining to draw independent factual conclusions from a low-quality, black and white video without audio). The body-worn camera footage in question here, which was taken by a non-party sheriff's deputy, is fairly dark (given the time of day when the arrest took place), occasionally muffled, and somewhat distant, although it does help frame the

general circumstances and particularly the split-second decision by Detective Kowalczyk made to take plaintiff to the ground.

Moreover, for purposes of an excessive force claim, "reasonableness" also lacks precise definition; instead, it requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Abbott*, 705 F.3d at 724 (quoting *Scott*, 550 U.S. at 383). Relevant factors include: "the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime [ . . . ;] and whether the person was interfering or attempting to interfere with the officer's duties." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). Ultimately, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (cleaned up).

As a threshold matter, both parties' arguments and proposed findings of fact rely heavily on less than 80 seconds of body-worn camera footage depicting some of plaintiff's initial encounter with defendants and his arrest. According to plaintiff, defendants Kowalczyk and Malovrh used excessive force against him at three points during their encounter: (1) his initial takedown by Kowalczyk; (2) the swing of Malovrh's rifle barrel at his head as or just after he was taken to the ground; and (3) the placement of Malovrh's knee (or perhaps shin) on his neck, head, and upper back while he was being handcuffed. Plaintiff only moves for summary judgment on his takedown by Kowalczyk. In support of

10

defendants' motion for summary judgment, defendants Kowalczyk and Malovrh claim that each of these uses of force was reasonable as a matter of law, or in the case of the rifle swing and ear injury, not supported by evidence in the record.

Although plaintiff initially argued in briefing that the overall, difficult circumstances of executing a search warrant in the dark, including multiple buildings and suspects, should somehow be blamed on the remaining two defendants, his counsel conceded at oral argument that this is neither factually nor legally correct.[6]  Regardless, while probable cause to arrest does not foreclose a claim that a police officer used excessive force in effecting that arrest, *Abbott*, 705 F.3d at 724, the Seventh Circuit has rejected the view that a use of force is unreasonable simply because an officer's earlier mistakes helped create a situation that required a use of force.  *See Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 698 (7th Cir. 2020) ("The officers might have made mistakes, and those mistakes might have provoked [the decedent's] violent resistance.  Even if so, however, it does not follow that their actions violated the Fourth Amendment.").  Thus, the court examines the three, principal components of plaintiff's excessive force claim against that challenging backdrop.

## I.  Takedown

First, plaintiff contends that he was unreasonably taken to the ground by defendant Kowalczyk despite walking out of his camper, following defendants' commands, putting his hands up, and not resisting arrest, while defendant Kowalczyk asserts that plaintiff,

---

[6] In briefing, plaintiff also faults defendants for acting as though they were under a "no knock" search warrant, when the issuing judge in fact denied that request.  Still, as counsel conceded during oral argument, any relevance of the warrant requiring a knock is undermined as to Steinhoff because he came willingly to the camper door and stepped out of his own volition.

upon exiting the camper, seemed to be moving in a manner to flee.  When each party's claims are evaluated under the appropriate standard, plaintiff cannot show that it was unreasonable as a matter of law for defendant Kowalczyk to use the force he did, particularly if defendants' version of the disputed facts were credited, but defendants make a strong case that the decision to take plaintiff to the ground was reasonable even accepting plaintiff's version of events.

In support of that argument, defendant Kowalczyk principally points to: (1) the video showing plaintiff appearing to stop turning around as directed once pointed towards an open field and wooded area; and (2) the probability that plaintiff would attempt to flee based on his prior criminal history, as discussed during the SWAT team's preparation meeting that defendants attended before executing the search warrant.  Although Kowalczyk's subjective beliefs are not dispositive, especially when drawing all reasonable inferences against him, it could still have been objectively reasonable for an officer to take plaintiff to the ground if he appeared to no longer be cooperating, be escaping or present a danger.  Unfortunately, it is unclear from the body-worn camera footage whether plaintiff was trying to flee, but a jury viewing it could reasonably conclude that he was based on the video and crediting defendants' testimony.

When drawing all inferences from the body-worn camera footage and plaintiff's testimony in his favor, the court cannot say that a reasonable jury could *not* conclude that plaintiff was cooperating with defendants' efforts to detain him and never attempted to flee.  Certainly, officers are entitled to use force to secure the arrest of a suspect who has demonstrated a desire to flee and subsequently surrenders. *Johnson v. Scott*, 576 F.3d 658,

659-60 (7th Cir. 2009).  In certain situations, as plaintiff points out, jurors can also reasonably conclude that grabbing a non-resisting subject, who has not demonstrated an intent to escape, then taking him to the ground constitutes excessive force.  *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003).

However, plaintiff's takedown must be viewed within its specific circumstances:  a pre-dawn, warranted drug search being executed on a property associated with drug trafficking.  To begin, the parties do not dispute that defendants had the authority to detain plaintiff briefly during the warrant execution, given that a search for drug contraband was underway.  *See Michigan v. Summers*, 452 U.S. 692, 705 (1981).  Moreover, defendants rightly point out that because "drug crimes . . . are associated with violence," *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009), objective officers are "especially sensitive to any behavior on [plaintiff's] part that appeared threatening [or] portended flight."  (Defs.' Opening Br. (dkt. #38) 7.)  Indeed, even though defendants did not see that plaintiff *was* armed, objectively reasonable officers could conclude that where serious drug trafficking is involved, weapons may well be present.  *See United States v. Jones*, 900 F.3d 440, 449 (7th Cir. 2018) ("given the dangers of drug trafficking, guns and drugs often go hand in hand").  Defendants were also aware of plaintiff's prior convictions, including one for resisting arrest, which objective officers may similarly take into account when deciding on a reasonable amount of force to use during his arrest.  *Burton v. City of Zion*, 901 F.3d 772, 781 (7th Cir. 2018) (citing *DeLuna v. City of Rockford*, 447 F.3d 1008, 1010, 1012 (7th Cir. 2006)).

Further, because police officers are "often forced to make split-second judgments --
in circumstances that are tense, uncertain, and rapidly evolving," *Abbott*, 705 F.3d at 724
(quoting *Graham*, 490 U.S. at 397), they are given "considerable leeway" with respect to
their assessments as to the appropriate amount of force to use in a particular situation. *Id*.
(quoting *Baird*, 576 F.3d at 344). Certainly, viewing the facts in the light most favorable
to defendants, a reasonable jury may find that an objectively reasonable officer could take
plaintiff to the ground given the totality of circumstances. Even when factual inferences
are drawn in plaintiff's favor -- while still crediting defendants' argument that the search
warrant execution presented an elevated risk due to the nature of methamphetamine
trafficking -- the calculus is substantially similar. Still, the Seventh Circuit has recognized
in the context of arrests, "as the threat changes, so too should the degree of force." *Cyrus*,
624 F.3d at 863. And were there no indicia of attempted or impending flight, officers
cannot continue using force against a suspect who is both subdued *and* complying with the
officer's orders. *Johnson*, 576 F.3d at 660. As *Johnson* explains, reasonableness "depends
critically on the fact that the suspect is indeed subdued." *Id*.

Here, even if plaintiff were found to be totally cooperating with the officers' orders,
he had not yet been subdued when defendant Kowalczyk took him down. Indeed, Deputy
Niemi's body-worn camera footage makes plain -- and the parties do not contest -- plaintiff
was not handcuffed until approximately 40 seconds *after* he was taken to the ground. (B.
Cam. 7:50-8:33.) Thus, when viewing the facts in the light most favorable to plaintiff, a
reasonable jury is almost certainly going to find that an objective officer's use of force in
taking Steinhoff to the ground and subdue him was not unreasonable given the fluid and,

14

at best, murky dynamics of an early morning raid of a suspected drug compound under the indisputable and fraught circumstances established in the video and instruction that officers are entitled to use "some degree of physical coercion" to effect an arrest or investigatory stop. *Graham*, 490 U.S. at 396.

Even if not, Kowalczyk's decision is protected by qualified immunity. For plaintiff to overcome defendants' qualified immunity claim, he must show that defendants violated his clearly established constitutional right. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). And even though qualified immunity is an affirmative defense, plaintiff bears the burden of defeating it. *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). Certainly, controlling case law clearly establishes a claim for excessive force if: (1) there is a "closely analogous case" holding that the specific type of force used by the defendants is excessive; or (2) "a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question." *Cibulka v. City of Madison*, 992 F.3d 633, 639-40 (7th Cir. 2021) (internal quotation marks and alterations omitted). Moreover, within this circuit at least, significant force is unreasonable after a suspect has stopped resisting. *See Snowden v. Henning*, 72 F.4th 237, 246 (7th Cir. 2023) ("the legal landscape of excessive-force claims is well settled, with decades of circuit precedent applying the Supreme Court's test announced in *Graham v. Connor*"); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest."); *Morfin*, 349 F.3d at 1005 (jury could conclude grabbing non-resisting subject, twisting his arm, shoving him toward the wall, and taking him to the floor was excessive force).

15

Acknowledging that these general principles will leave a jury with the final word on many discretionary takedowns, "clearly established law" does not exist at a "high level of generality." *Kisela v. Hughes*, 584 U.S. ----, 138 S. Ct. 1148, 1152 (2018) (per curiam). Thus, precedent must be "particularized to the facts of the case," *Dockery*, 911 F.3d at 466, especially excessive force cases, because the "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case." *City of Escondido v. Emmons*, 586 U.S. ----, 139 S. Ct. 500, 503 (2019) (per curiam).  In particular, as defendants point out, officers are entitled to qualified immunity for a takedown of a *resisting* subject.  *E.g., Dockery*, 911 F.3d at 461 (video showed subject "flailing and kicking and actively resisting being handcuffed"); *Catlin*, 574 F.3d at 368 (subject admitted that he "struggled and managed to break free"); *Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1010-14 (W.D. Wis. 2020) (subject "yelled loudly, tensed his arms, locked his hip and knee joints, and used deadweight and counterbalance measures to resist being moved"). The same is true for a subject attempting to flee.  *See Pryor v. Corrigan*, No. 17-cv-1968, 2021 WL 1192581, at *12 (N.D. Ill. March 30, 2021) (undisputed that subject fled from lawful traffic stop).

As plaintiff notes, defendants do not discuss, distinguish, or even cite the Seventh Circuit's decision in *Morfin*, 349 F.3d at 989, which stands for the proposition -- nearly six years before the events relevant to this case -- that a jury could find officers used excessive force where the plaintiff "had not been a threat to officers, was docile and cooperative, and did not resist in any way until the officers applied unnecessary force." *Abbott*, 705 F.3d at 732 (citing Morfin, 349 F.3d at 1005).  However, *Morfin*, upon which plaintiff places great

reliance, is not this case either.  The arrestee in *Morfin* was "docile and cooperative" and not resisting any of the arresting officers' actions before they took him to the ground.  349 F.3d at 994, 1004-05.  Moreover, the totality of the circumstances matters; the arrestee in *Morfin* was being detained on a charge of disorderly conduct at a barbershop being prepared to serve as a polling location -- a far cry from the vastly more dangerous circumstances under which plaintiff was taken to the ground here.  Nor does a district court case relying on *Morfin* that plaintiff also cites, *Chavez-Garcia v. Arona*, No. 17-cv-6136, 2020 WL 902827 (N.D. Ill. Feb. 25, 2020), provide the support needed to overcome his burden to show clearly established law.  First, that case involved an individual tackled by DEA officers who lacked evidence suggesting he was even involved in the controlled buys they had set up.  With the benefit of a real-time video of the events surrounding defendant Kowalczyk's split-second decision to effect a takedown of the plaintiff, the court is unable to find his action violated clearly established law.  If anything, the differences between *Chavez-Garcia* and plaintiff's case show how important the facts of each decision are to a proper qualified immunity analysis.  Second, and equally important, *Chavez-Garcia* is an unreported, out-of-district decision that cannot clearly establish a constitutional violation.  *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995).

After oral argument on December 19, 2023, the court gave plaintiff a further opportunity to provide supplemental authority supporting his claim that the law in the Seventh Circuit had already clearly established that defendant Kowalczk had no discretion to proceed with a takedown unless plaintiff was plainly not cooperating, not attempting to escape or presenting a danger to himself or others.  However, the case that he subsequently

provided -- *Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019) -- does not bear the weight of clearly established law.  (Dkt. #59.)  To begin, *Johnson* could not have been "existing precedent" that placed the constitutional question "beyond debate" when it was decided over a year *after* plaintiff was arrested.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  In addition, the other precedent the *Johnson* court cites for the proposition that "on-the-spot punishment, not reasonably adapted to obtain or keep control" violates the Fourth Amendment all concerned offenses (or a clear lack thereof) far less serious than plaintiff was suspected of, arresting officers' conduct that was far more egregious, and surrounding circumstances substantially less pronounced than those encountered by the defendant Kowalczk.  Finally, in *Johnson* itself, the Seventh Circuit upheld a district court's grant of qualified immunity in the absence of a "clearly established rule forbidding a clean takedown to end mild resistance of the sort that Johnson displayed."  944 F.3d at 969.  Even though plaintiff maintains that he was not resisting defendants at all -- which the court credits for purposes of its qualified immunity analysis except to the extent the videotape shows just how unclear that claim would have been to an objective officer viewing plaintiff's movements -- he has not been able to find any controlling, clearly established law prohibiting the use of a takedown under the dynamic circumstances presented to Kowalczyk, nor has this court.  Thus, plaintiff's failure to show that a clearly established constitutional right existed at the time is "fatal" for his Fourth Amendment claim against defendant Kowalczyk.  *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

## II.   Rifle Barrel

Second, plaintiff argues that having seen a rifle barrel hit him on the side of his head after he was taken to the ground is enough for a reasonable jury to find that defendant Malovrh deliberately or recklessly swung the barrel of his gun at his head.  Even discounting defendants' own flat denials that any one of them intentionally hit plaintiff with a weapon during his arrest, they argue no jury could find defendant Malovrh intentionally or recklessly struck plaintiff with his rifle barrel.  Certainly, plaintiff must concede a lack of personal knowledge as to Malovrh's actions, except that he ended up being hit by a rifle barrel.  So the real question is whether the fact that he was hit would support a reasonable inference, substantiated by specific facts, that Malovrh intentionally or recklessly caused it.  *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

In fairness, a jury might reasonably infer that defendant Malovrh was the likely officer nearest him with a rifle slung over his left shoulder and pointed at the doorway when plaintiff appeared.  However, after that, a jury is only left to speculate as to how, much less why, Malovrh's rifle barrel ended up striking him.  If anything, it seems far more likely that as Malovrh went to the ground to aid in subduing plaintiff, his rifle strap pulled the rifle around toward plaintiff, hitting plaintiff in the side of his head.  Whether it was wise for officers conducting the searches to even have automatic weapons on a sling is perhaps open to debate, but it is frankly Monday-morning quarterbacking of the whole execution of the search warrant here, not evidence of any intent or recklessness by this specific officer.  At worst, Malovrh's split-second decision to participate in subduing Steinhoff with an automatic rifle slung loosely at his side might support a finding of

19

negligence or perhaps gross negligence, not the much higher standard for a finding of excessive force. *Burton*, 901 F.3d at 780 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015)).  Aside from plaintiff's own testimony, the only evidence he can point to is the body-worn camera footage, which is far from dispositive; at most, it provides evidence of a rifle shadow seemingly swinging free momentarily to the left of the initial takedown and near the camper wall, an audible "clink" that can be heard as Kowalczyk took plaintiff down, and then plaintiff's later complaints about his head being "bust open."  (B. Cam. 7:41-42; 7:50-8:33.)

While "significant force is unreasonable after a suspect has stopped resisting," *Alicea v. Thomas*, 815 F.3d 283, 288-89 (7th Cir. 2016), the only evidence for purposes of summary judgment is that defendant Malovrh chose to assist in subduing plaintiff with a rifle in a sling on his left shoulder after another officer chose to effect a takedown.  Although plaintiff received stitches for a cut on his ear and complained of a cracked eardrum, where officers "use steps reasonably likely to effect a clean takedown, an injury does not lead to liability," much less denial of qualified immunity.  *Johnson*, 944 F.3d at 969.  Further, the law recognizes that "any takedown can go awry."  *Id*.  At most, plaintiff can show that he was unfairly hit by the barrel of a gun carried by defendant Malovrh as, or after, defendant Kowalczyk took him to the ground, but a jury could not reasonably find that this apparent accident constituted excessive use of force in violation of the Fourth Amendment.

### III.    Knee Restraint

Third, plaintiff claims that it was unreasonable for defendant Malovrh to place his knee on plaintiff's head, neck, and shoulder while he was in the process of being handcuffed

behind his back.  If a jury were to find that plaintiff was resisting arrest or, perhaps in the alternative, was "writhing" in pain,[7] then Malovrh's efforts to stabilize him, however crude for the short time necessary to apply handcuffs, is unlikely to constitute excessive force. (Defs.' Opening Br. (dkt. #38) 11-15.)   However, plaintiff swears that that he had surrendered fully to defendants once on the ground, and defendant Malovrh had complete control when he kneeled on plaintiff.  (Pl.'s Resp. Br. (dkt. #46) 12-13.)   Further, at his deposition, plaintiff testified that defendant Malovrh "was stomping [plaintiff's] face into the ground with his knee" and "jamming [his knee] on [plaintiff's] neck, like stomping [plaintiff's] neck."  (Steinhoff Dep. (dkt. #32) 65.)   Moreover, the parties agree that defendant Malovrh's use of force against plaintiff's neck would be excessive if he were subdued and complying fully with defendants' orders.  *Johnson*, 576 F.3d at 660.

Since at summary judgment, the court must credit plaintiff's assertion that he was complying with defendants' orders and submitting to arrest, this would appear a matter for a jury to resolve, even under all the challenges confronting the officers here.  Still, plaintiff does not dispute that he had yet to be handcuffed when defendant Malovrh was using force against his head and neck, *and* he concedes that after he was handcuffed, defendants "rolled [him] to his side almost immediately and stood [him] up."  (Pl.'s Resp. to Defs.' Proposed Findings of Fact (dkt. #47) ¶ 89.)   The court recognizes that kneeling on an individual's neck can be dangerous and, under most circumstances, unreasonable.  Should

---

[7] Both sides describe defendant Malovrh restraining plaintiff with his shin or knee, using those terms interchangeably.  (Defs.' Opening Br. (dkt. #38) 11-15; Pl.'s Resp. Br. (dkt. #46) 12-13.) For purposes of this use of force analysis, an officer alternating pressure with a knee to the neck, even for thirty seconds, would seem more likely to support a claim of excessive force.

the evidence show that any force applied to plaintiff's neck was brief and incidental to the officer's efforts to subdue him, however, the specific circumstances may render Malovrh's actions something less than excessive force. *See Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) ("Kneeling with just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death.").

Even if his claimed knee pressure on plaintiff's head and neck precludes summary judgment on the merits of plaintiff's Fourth Amendment claim against defendant Malovrh, his conduct might be subject to qualified immunity. The law seems clearly established that an officer may not apply knee pressure to a suspect's neck once in handcuffs, but is less specific as to the circumstances where some pressure may be allowed while an officer is still trying to subdue a suspect. *Compare Baillargeon v. Huber*, 2023 WL 4144733 (W.D. Mich. June 23, 2023) (unreasonable to push face of reckless motorcyclist who fled police into the floor after he was handcuffed, with officer's knee in his neck and back); *Jones v. City of Fort Wayne*, 2017 WL 1059015 (N.D. Ind. March 21, 2017) (not clearly established that officer used excessive force by applying knee on neck of arrestee for DUI while officers attempted to place him in handcuffs); *with Lewis v. City of Albany Police Dept.*, 547 F. Supp. 2d 191 (N.D.N.Y. 2008)(excessive force where officer stepped on the head of an under control, handcuffed suspect and ground his head into the pavement). However, given the disputed material facts as to the range of Investigator Malovrh's actual actions in subduing plaintiff -- from whether Steinhoff was resisting at all to whether Malovrh "was stomping

[plaintiff's] face into the ground with his knee" and "stomping [plaintiff's] neck" -- any application of qualified immunity will turn on the specific facts decided at trial, just as it will on the merits. Accordingly, this claim against defendant Malovrh and all of the disputed facts leading up to his ultimate efforts to subdue plaintiff Steinhoff will proceed to trial.

Finally, defendants argue that all of Steinhoff's claims against the counties should be dismissed because Wis. Stat. § 895.46 does not provide a private cause of action for indemnification. *Jackson v. Graves*, No. 14-cv-1206, 2015 WL 5577527, at *4 (E.D. Wis. Sep. 22, 2015); *see also Williams v. Michalsen*, No. 19-cv-56, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020) ("If the individual officers are found liable, the indemnity mandated by § 895.46 will be triggered; the plaintiffs do not need to sue the county for that to happen."). Defendants are correct that Steinhoff would not be able to bring a freestanding claim against the counties. But if he prevails on his Fourth Amendment claims against one of the counties' employees, Steinhoff may be entitled to a declaratory judgment that the counties are obligated to indemnify him. For that reason, this court has held in recent cases, it is appropriate and efficient to keep a county as a defendant for the purpose of ordering complete relief. *E.g.*, *Voegeli v. City of Janesville*, No. 20-cv-845, 2021 WL 4501837, at *4 (W.D. Wis. Oct. 1, 2021); *Holte v. City of Eau Claire*, No. 20-cv-131 (W.D. Wis. July 15, 2021); *Estate of Smith by Bryfczynski v. Oneida Cty.*, No. 19-cv-972, 2021 WL 2188220, at *12 (W.D. Wis. May 28, 2021). However, Clark County's possible role in the case will not be disclosed to the jury, and both counties' names will be removed from

the caption of any captioned document that the jury is shown, and the parties will not present any evidence or argument about the county's role as indemnitor.

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for partial summary judgment (dkt. #33) is DENIED.

2) Defendants' motion for summary judgment (dkt. #37) is GRANTED in part and DENIED in part as set forth above.

Entered this 22nd day of December, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge